# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

### No. 14-1112V
### Filed: July 28, 2017

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | PUBLISHED |
| P.H., a minor, by and through his parent * | |
| and natural guardian, * | |
| ASHLEY PUROLL, * | |
| * | |
| Petitioner, * | |
| * | Re-issued Decision Awarding Damages; |
| v. * | Pain and Suffering; Rotavirus; |
| * | Intussusception. |
| SECRETARY OF HEALTH * | |
| AND HUMAN SERVICES, * | |
| * | |
| Respondent. * | |
| * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | |

*Paul R. Brazil,* Muller Brazil, LLP, Dresher, PA, for petitioner.
*Jennifer L. Reynaud,* U.S. Department of Justice, Washington, DC, for respondent.

## DECISION[1] AWARDING DAMAGES[2]

**Dorsey**, Chief Special Master:

On November 14, 2014, Ashley Puroll ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[3] (the "Vaccine Act" or "Program") on behalf of her son, P.H.

---

[1] The original decision issued on February 23, 2017, was withdrawn after respondent filed a motion for reconsideration on March 15, 2017. *See* Order Granting Motion for Reconsideration dated March 15, 2017 (ECF No. 71).

[2] Because this decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. §3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. §300aa (20012).

Petitioner alleged that P.H. suffered intussusception requiring surgical intervention which was caused by the rotavirus vaccine he received on August 12, 2014.  Petition at 1.  The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.  Thereafter, pursuant to Vaccine Rule 3(d), this case was reassigned to the undersigned's non-SPU docket due to the number of complications suffered by P.H. and further time needed to resolve the case.  Order Reassigning Case, filed Apr. 11, 2017 (ECF No. 75).

For the reasons discussed below, the undersigned now finds petitioner is entitled to a total award of **$293,930.96**.

## I.     Procedural History

Three days after filing her petition, petitioner filed P.H.'s medical records.  *See* Exhibits 1-4, filed Nov. 17, 2014 (ECF No. 3); Statement of Completion, filed Dec. 5, 2014 (ECF No. 8); *see also* Status Report, filed Feb. 2, 2015 (indicating respondent agreed that the medical records were complete).  An initial status conference was held with the staff attorney managing this case on December 19, 2014.  Order, filed Dec. 23, 2014, at 1 (ECF No. 9).

On February 9, 2015, respondent filed a status report indicating he believed P.H.'s injury was caused by the rotavirus vaccine administered to him on August 12, 2014.  Status Report at 1 (ECF No. 12).  Respondent further indicated he had made an offer which petitioner was considering.  *Id.*  Over the subsequent four month period, the parties agreed upon the compensation to be awarded to petitioner, and petitioner obtained the necessary Medicaid lien information.  *See* Status Report, filed Mar. 27, 2015 (ECF No. 14); Order, issued May 6, 2015 (ECF No. 16).  Petitioner also filed a letter from Patricia Fink, PA, regarding P.H.'s current condition and prognosis.[4]  Exhibit 5, filed June 8, 2015 (ECF No. 17).  On June 10, 2015, respondent filed a joint Rule 4 report and proffer.  (ECF No. 18).

A decision awarding damages was issued on June 11, 2015.  Before judgment entered, petitioner filed a motion for reconsideration due to unexpected complications suffered by P.H. after the decision date.  Motion for Reconsideration, filed July 9, 2015 (ECF No. 21).  She filed updated medical records describing these complications.  *See* Exhibit 6, filed July 10, 2015 (ECF No. 23).  Petitioner's motion was granted and the decision was withdrawn.  Order, issued July 13, 2015 (ECF No. 25).

The undersigned conducted several telephonic status conferences with the parties.  *See* Orders, issued Apr. 22 and June 21, 2016 (ECF Nos. 48, 50) (for a description of those discussions and the undersigned's instructions to the parties).  Petitioner continued to file additional evidence of P.H.'s medical treatment, current

---

[4] Ms. Fink is one of the physician's assistants at the clinic where P.H. receives his primary care, Muskegon Family Care.  *See* Exhibit 1.

condition, and prognosis.  *See* Exhibits 7-16, filed Apr. 5, July 18, Aug. 10, Aug. 24, and Sept. 29, 2016 (ECF Nos. 45, 51, 54-55, 57).

A telephonic status conference was held with the staff attorney managing this case on October 12, 2016.  During the call, the staff attorney presented the different options the undersigned was considering for this case going forward: 1) alternative dispute resolution; 2) a determination regarding the issue of pain and suffering from the undersigned after briefing from the parties; and 3) a damages hearing.  *See* Damages Order, filed Oct. 14, 2016, at 2 (ECF No. 60).  The parties agreed that the undersigned should determine the issue of entitlement so the case could officially move into the damages phase.  Ruling on Entitlement, filed Oct. 14, 2016, at 2 (ECF No. 59).  Respondent's counsel indicated respondent still conceded the issue of entitlement and had no objection to the undersigned finding petitioner entitled to compensation based upon her concession set forth in the June 10, 2015 Rule 4 report.  *Id.*  The Ruling on Entitlement was issued on October 14, 2016.  Ruling on Entitlement at 2.  The parties were ordered to file a joint status report "providing their preferences regarding the next step going forward in this case."  Damages Order at 2.

On October 28, 2016, the parties filed a joint status report indicating they "have decided to submit briefs on damages and request a decision."  (ECF No. 61).  Briefs were submitted by the parties and a decision awarding damages was issued on February 23, 2017, which awarded petitioner $225,000.00 for actual pain and suffering and $49,000.00 in projected pain and suffering.  Decision Awarding Damages (ECF No. 69).

On March 15, 2017, respondent filed a motion for reconsideration and requested that the February 23, 2017 Decision be withdrawn because the statutory cap of $250,000 was not applied prior to adjusting the award for future pain and suffering to net present value.  Motion for Reconsideration, filed Mar. 15, 2017 (ECF No. 70) at 2-3; *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552, 554-55 (Fed. Cir. 1994); 42 U.S.C. §300aa-15(a)(4)(statutory limit for actual and projected pain and suffering); 42 U.S.C. §300aa-15(f)(4)(A)(requirement regarding net present value).  Additionally, respondent argued that the amount allowed for future pain and suffering should be reduced to net present value using a net discount rate of two percent.  Motion for Reconsideration at 3.  The undersigned granted respondent's motion for reconsideration and withdrew her February 23, 2017 Decision.  Order Granting Respondent's Motion for Reconsideration dated March 15, 2017 (ECF No. 71).  Petitioner was ordered to file a response by April 7, 2017.  Scheduling Order dated March 16, 2017 (ECF No. 72).

Petitioner filed a response on April 7, 2017, requesting that the undersigned increase the award in actual pain and suffering to $250,000.00 in consideration of P.H.'s ongoing pain and suffering since September 2016.  Petitioner's Motion for Relief from Order and Response to Respondent's Motion for Reconsideration, at 1, 3, and 5 (ECF No. 73).  Alternatively, petitioner requested that the undersigned deny in part

respondent's motion for reconsideration and reduce the net present value of the award for future pain and suffering by one percent.  *Id.* at 1, 4-5.  Petitioner filed P.H.'s updated medical records from January 11, 2017, which provided additional evidence of his medical treatment, current condition, and prognosis.  Exhibit 17 at 3-4; Exhibit 20 at 22-23.

On April 11, 2017, the undersigned ordered petitioner to file updated medical records and any additional evidence.  Order at 2 (ECF No. 74).  That same day, the case was reassigned to the undersigned's non-SPU docket due to the number of complications P.H. suffered and further time needed to resolve the case.  On May 30, 2017, petitioner filed additional updated medical records that provide further evidence of P.H.'s medical treatment, current condition, and prognosis.  <u>See</u> Exhibits 18-20.

On May 31, 2017, petitioner requested additional time to obtain and file a requested report from Dr. Peter Freswick, M.D.  Motion for Extension of Time (ECF No. 78).  The undersigned granted this motion.  Subsequently, petitioner requested an additional extension of June 7, 2017, to obtain and file the requested report.  Second Motion for Extension of Time (ECF No. 79).  The undersigned granted this motion, extending the due date to June 19, 2017.  Petitioner filed an expert report from Dr. Freswick on June 8, 2017, which included P.H.'s medical records from May 10, 2017.  Notice of Filing (ECF No. 80); Exhibit 21.

## II.    Factual History

P.H. was born on June 2, 2014, 10.5 inches in length and weighing eight pounds, ten ounces.  Exhibit 1 at 17.  At eight days old, he was bottle feeding approximately two ounces every three hours.  *Id.* at 16.  He was experiencing some feeding difficulties, coughing after feedings and suffering from gas.  *Id.*

On June 23, 2014, P.H.'s mother took him to the Muskegon Family Care because he had been vomiting for approximately one day.  Exhibit 1 at 14.  He was diagnosed with gastroenteritis.  His mother was instructed to continue fluids and to take him to the emergency room ("ER") if he developed a fever or became lethargic.  *Id.*

On July 3, 2014, P.H. belatedly attended his two week well-child check-up ("WCC").  He was noted to be "eating and sleeping well," and his earlier gastroenteritis was described as mild and resolved.  Exhibit 1 at 11. This record indicates that P.H.'s older sister suffered from pyloric stenosis[5] when she was three weeks old.  *Id.*  His immunizations were described as "[u]p to date."  *Id.*

Exactly one month later, on August 12, 2014, P.H. attended his two month WCC.  It was reported that he had suffered "[n]o recent illness," and had "[n]o new health

---

[5] Pyloric stenosis is "the "obstruction of the pyloric orifice of the stomach; it may be congential . . . or acquired due to peptic ulcers or prepyloric carcinoma."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1770 (32d ed. 2012).

concerns." Exhibit 1 at 7.  He received several immunizations at this visit, including the rotavirus vaccine.  *Id.* at 10.

On August 17, 2014, around 10:00 o'clock in the evening, P.H.'s mother called the after-hours service for the Muskegon Family Care because P.H. had been vomiting since 4:00 o'clock that afternoon and was refusing to eat.  Exhibit 1 at 6.  She was instructed to take P.H. to the ER.

P.H. arrived at the ER at Mercy Health Partners later that evening and was seen at ten minutes after midnight on August 18, 2014.  Exhibit 2 at 11.  His sister's pyloric stenosis was noted under family history.  *Id.*  He was observed to be well-hydrated, sleeping, nontoxic, and afebrile but still not interested in his bottle.  *Id.* at 12.  A chest x-ray was reported to be unremarkable.  *Id.*  P.H. was discharged early in the morning of August 18 with instructions to follow-up with his primary care provider if he did not take a bottle that morning.  *Id.*

After P.H. failed to improve or produce a bowel movement, he was taken to the ER at North Ottawa Community Hospital.  Exhibit 3 at 8, 21.  An abdominal x-ray revealed a suspected small bowel obstruction.  *Id.* at 22; *see id.* at 28 (x-ray results).  After speaking to Dr. James DeCou, M.D., a pediatric surgeon at DeVos Children's Hospital, the decision was made to transfer P.H. to that hospital.  Exhibit 3 at 22.

At DeVos Children's Hospital on August 19, 2014, an upper gastrointestinal ("GI") study was performed, revealing "obstructive bowel gas pattern suggestion of distal bowel obstruction."  Exhibit 4 at 9.  An emergent therapeutic air enema failed to reduce the intussusception.  *Id.* at 8.  P.H. was taken to the operating room for an exploratory laparoscopy and possible bowel resection.  *Id.* at 19-20.  Approximately four centimeters of bowel, including the distal part of the ileum, and P.H.'s appendix were removed.  Exhibits 1 at 65-66; 4 at 6-7 (surgical pathology report).  After the surgery, P.H. was transferred to general pediatrics.  Despite some initial fussiness and vomiting while feeding, P.H.'s bowel function returned, and he tolerated his diet well.  Exhibit 1 at 66.  P.H. was discharged on August 22, 2014.  *Id.*

In a later report, dated September 4, 2014, from P.H.'s surgeon, Dr. DeCou, to Ms. Fink at the Muskegon Family Care, P.H. was reported to be doing well at home, without vomiting, fever, or diarrhea.  Exhibit 1 at 89.  Dr. DeCou described his incision as healing, and P.H. was gaining weight and experiencing regular bowel movements.  *Id.*  On February 2, 2015, Ms. Fink reported P.H. had experienced recurrent constipation since his August 19, 2014 surgery.  Exhibit 5.

On January 27, 2015, P.H. was evaluated for dysphagia[6] by Dr. Harold Conrad, M.D. at the Gastroenterology Clinic at DeVos Children's Hospital.  *See* Exhibit 11 at 6.  P.H.'s diarrhea was described as varying from "firm to loose especially after [he] had

---

[6] Dysphagia is "difficulty in swallowing."  DORLAND'S at 579.

surgery for intussusception with a resection in the right lower quadrant." *Id.* It was noted that P.H. was gaining weight rapidly. *Id.* Dr. Conrad believed the dysphagia was resolved with a low flow nipple. *Id.* He prescribed the addition of four ounces of fluid and recommended soaking P.H.'s bottom in warm water. *Id.* at 8.

In mid-June 2015, P.H. "stopped passing gas and developed a distended abdomen." Exhibit 6 at 3. On June 21, 2015, he was admitted to DeVos Children's Hospital and underwent his second exploratory laparoscopy. *Id.* In her report, P.H.'s surgeon, Dr. Emily Durkin, M.D., indicated he had been seen in the ER on numerous occasions for vomiting and watery diarrhea over the last six to eight weeks. *Id.* Multiple adhesions were removed but no bowel re-section was required. *Id.* at 4. Following this surgery, P.H. developed a clostridium difficile ("*C. difficile*") infection[7] which was treated with metronidazole and vancomycin. Exhibit 8 at 2. He remained hospitalized on the pediatric acute care floor until June 29, 2015. *See* Exhibit 7 at 2 (letter from the nurse care manager explaining the need for P.H.'s mother to be by his side). In total, P.H. was hospitalized for nine days, from June 21 to 29, 2015.

On September 18, 2015, P.H. was assessed for his chronic diarrhea and dysphagia by a pediatric gastroenterologist, Dr. Andrew Singer, M.D., at C.S. Mott Children's Hospital. *See* Exhibit 8 at 3. Dr. Singer attributed P.H.'s diarrhea to his intussusception surgeries. *Id.* at 5. In particular, Dr. Singer believed the removal of P.H.'s terminal ileum resulted in "diminished bile absorption" and diarrhea. *Id.* He prescribed cholestyramine[8] for excess bile and a swallow study for P.H.'s dysphagia. *Id.* at 6.

On October 4, 2015, P.H. underwent a third exploratory laparotomy for bowel obstruction. P.H.'s surgeon for this procedure, Dr. Marc Schlatter, M.D. resected approximately 16 centimeters of bowel and spent 30 minutes removing adhesions. Exhibit 9 at 1-2. Prior to the surgery, P.H. presented at the ER with two days of complete constipation (obstipation[9]) and one day of vomiting. Exhibit 9 at 2. A nasogastric tube inserted in the ER which showed "mildly blood tinged output, but no copious output." *Id.* P.H. was hospitalized for seven days. Exhibit 15 at ¶ 10.

---

[7] Clostridium difficile is a species of bacteria "that is part of the normal colon flora in infants and some adults." DORLAND'S at 374. "[I]t produces a toxin that can cause pseudomembraneous enterolitis in patients receiving antibiotic therapy." *Id.* "*C. difficile* infection can range from mild to life-threatening" and "can lead to a hole in the intestines, which can be fatal if not treated immediately." http://www.webmd.com/digestive-disorders/clostridium-difficile-colitis#1 (last visited on Jan. 12, 2017). *C. difficile* infection usually affects patients in hospitals or long-term care facilities and flourishes because long-term antibiotic treatment has killed other intestinal bacteria which would keep it in check. *Id.*

[8] Cholestyramine resin has an affinity for bile acids and binds with them to form an insoluble complex that is excreted in the feces. DORLAND'S at 1626.

[9] Obstipation is "intractable constipation." DORLAND'S at 1310.

On December 16, 2015, P.H. returned to the Gastroenterology Clinic at DeVos Children's Hospital for abdominal pain and diarrhea.  Exhibit 13 at 9-10.  Although the cholestyramine prescribed by Dr. Singer in September 2015 initially improved P.H.'s stools significantly, more recently P.H.'s mother noticed an improvement when the medication was accidently missed, so she stopped administering it.  *Id.*  At this visit, P.H. was seen by Dr. Freswick, who noted that he was doing well but that he still had some looser stools and currently was experiencing "a significant diaper rash."  *Id.* at 10.  Dr. Freswick diagnosed "a possible yeast infection" and ordered nystatin cream.  *Id.* at 14.

P.H. saw Dr. Freswick again on April 11, 2016, for diarrhea.  Exhibit 13 at 18.  P.H.'s diarrhea had increased over the last two months, and he was experiencing two to six bowel movements per day.  *Id.* at 21.  Dr. Freswick restarted the cholestyramine and ordered a stool study and culture for dysbiosis.[10]  Exhibit 13 at 25.

In a letter dated September 16, 2016, Dr. Freswick opined that the loss of bowel experienced by P.H. would not be enough to "significantly increase his risk of malabsorption," adding that P.H.'s growth had been excellent.[11]  Dr. Freswick indicated that, according to reports from his mother, P.H. had suffered from intermittent diarrhea since his first surgery in August 2014.  While acknowledging that multiple surgeries like those experienced by P.H. can increase a patient's risk of diarrhea, Dr. Freswick opined that "any diarrhea [P.H.] is currently experiencing could be caused by a number of etiologies."  Exhibit 16 at 1.  Dr. Freswick mentioned P.H.'s earlier *C. difficile* infection but concluded that P.H.'s diarrhea was "most likely due to excessive sugar intake."  *Id.*  He explained that P.H. "tested positive for unabsorbed sugar on April 19, 2016."  *Id.*  Small bowel resection was listed as a problem in Dr. Freswick's medical records, along with dysphagia, allergic rhinitis, asthma, and iron deficiency anemia.  Exhibit 13 at 5-6.

In her affidavit dated September 29, 2016, petitioner indicated P.H. "never fully recovered" from his August 2014 illness and surgery.  Exhibit 15 at ¶ 7.  She described his diarrhea as occurring on a daily basis, causing frequent diaper rash.  *Id.*  When describing P.H.'s three surgeries, his mother indicated that he had a fourth obstruction on December 12, 2015, which was treated with a suppository.  *Id.* at ¶ 11.  Most likely, she is referring to the December 16, 2015 visit with Dr. Freswick.  At that visit, P.H. is listed as suffering from abdominal pain.  Exhibit 13 at 9.  P.H.'s mother maintained that P.H. has suffered from diarrhea one to three times per day and frequent diaper rashes for the past two years.  *Id.* at ¶ 13.  She also addressed his surgical scarring which still causes him pain.  *Id.* at ¶ 14.  She added that P.H. has become self-conscious about

---

[10] Dysbiosis is a "variation from the normal composition of the microflora of the gut." DORLAND'S at 576.

[11] Exhibit 16 at 1. Dr. Freswick indicated that P.H. had lost a total of 14 centimeters of bowel, but the records indicated approximately 4 centimeters were resected during his August 19, 2014 surgery and 16 centimeters were resected during his October 4, 2015 surgery.  *See* Exhibits 1 at 65-66; 4 at 6-7; 9 at 1-2.  However, this total of 20 centimeters is still less than the 60 centimeters Dr. Freswick believes would have to be lost before the risk of malabsorption is significant. Exhibit 16 at 1.

the scarring, preferring to keep his shirt on and refusing to let others see his stomach. *Id.* She worries that P.H. may be ridiculed at school and may experience another obstruction in the future. *Id.* at ¶ 15. Acknowledging that P.H. may not understand that risk now, she believes he will in the future. *Id.* Petitioner has filed a picture of P.H.'s abdominal scarring which shows a defined horizontal scar from just above his navel to over two-thirds of the way to his right side. *See* Exhibit 14.

On November 1, 2016, P.H. saw Dr. Freswick again for diarrhea. Exhibit 18 at 70, 74-75. He started P.H. on Metamucil to treat his diarrhea and ordered labs to determine P.H.'s iron and vitamin levels. *Id.* at 74-75. Dr. Freswick prescribed P.H. cream to treat his diaper dermatitis.[12] *Id.* Petitioner told Dr. Freswick that he had been consuming six ounces of milk daily, little sugar and fruit, and no juice. *Id.* at 74.

On December 30, 2016, P.H. visited the Helen DeVos Children's Hospital Blood Management Clinic where he was diagnosed with iron deficiency anemia. Exhibit 20 at 13, 15. P.H. had been suffering from diarrhea and blood in his stool on and off for more than one year. *Id.* at 14. His low iron levels were attributed to the removal of part of his small bowel and diarrhea. *Id.* at 15. An iron challenge and iron infusion were scheduled. *Id.* It was also noted that P.H. had several rashes in his groin area. *Id.* at 14.

P.H. underwent an iron challenge on January 11, 2017. Exhibit 20 at 21. The day before this visit, P.H. had six diarrhea stools. *Id.* at 22. The iron challenge testing found that although P.H. absorbed iron well, the volume of his diarrhea impacted his ability to absorb iron. *Id.* at 23.

On May 10, 2017, P.H. returned to see Dr. Freswick because he was suffering from moderate abdominal pain that was treated as gastritis. Exhibit 21 at 7-8, 13. The report also noted that P.H. was still experiencing diarrhea. *Id.* at 8.

## III.   Findings of Fact

P.H. underwent three surgeries to treat his intussusception from August 2014 through early October 2015. Additionally, he suffered abdominal pain in December 2015 which resolved without surgery.

The first of P.H.'s surgeries occurred on August 19, 2014. He was hospitalized in the general pediatric unit for four days following intussusception surgery, and he initially appeared to recover well. Only four centimeters of bowel were removed, but this included his terminal ileum. As noted by Dr. Singer, the removal of P.H.'s terminal ileum caused diminished bile reabsorption and diarrhea. Exhibit 8 at 5. Post-operatively, P.H. had dysphagia and diarrhea. Exhibit 11 at 6.

---

[12] Dermatitis is "inflammation of the skin." DORLAND'S at 494. Diaper dermatitis is "irritant dermatitis in the area in contact with the diaper in infants." *Id.*

P.H. again suffered symptoms of intussusception in June 2015. A second surgery was performed on June 21, 2015, and multiple adhesions were removed. The medical records show that P.H. contracted a *C. difficile* infection following this surgery. He was hospitalized for nine days and this time was housed in the acute care pediatric wing. Post-operatively, P.H. again suffered dysphagia and chronic diarrhea.

P.H.'s third surgery occurred approximately four months later on October 4, 2015. A significant amount of bowel was resected during this surgery. The contemporaneously created medical records from the surgery describe the amount removed as 16 centimeters in at least two instances.[13] Furthermore, the surgeon notes that, during the surgery, he found "approximately 12 centimeters section of extremely dusky bowel that did not look viable just proximal to the previous ileocolic anastomosis." Exhibit 9 at 1.

In her affidavit, petitioner stated that P.H. suffers from diarrhea, and he will need to visit the bathroom more often once he begins school. She also stated P.H. complains that his scarring hurts and that he is self-conscious about removing his shirt.

Since the February 23, 2017 Decision was issued, P.H. has suffered more severe and enduring complications than Dr. Freswick's September 16, 2016 letter initially anticipated. P.H. continues to suffer from a significant amount of diarrhea. The complications from the diarrhea have required P.H. to visit the doctor at least five times since September 2016.[14] The iron challenge showed that P.H. absorbed iron well; therefore, his anemia has been attributed to the diarrhea. Additionally, the persistent diarrhea has caused P.H. to suffer from diaper dermatitis. At P.H.'s latest doctor visit on May 10, 2017, P.H. was still suffering from diarrhea. The undersigned finds that P.H.'s condition continues to persist, and that he will likely continue to suffer from this condition in the future.

## IV.  Arguments

### A.  Petitioner's Brief

Petitioner seeks compensation in the amount of $250,000.00 for actual pain and suffering and $140,000.00 for projected pain and suffering. Pet. Brief at 5. Noting that the total amount for pain and suffering awarded under the Vaccine Program cannot exceed $250,000.00, petitioner communicated her understanding that the amount awarded for projected pain and suffering may be reduced accordingly. *Id.* at 5 n.1.

---

[13] On this point, there is some disagreement within the medical records. The records from the surgery indicate that 16 centimeters of bowel was removed, while Dr. Freswick notes only 10 centimeters were removed. *Compare* Exhibit 9 *with* Exhibit 16. For purposes of this decision, the undersigned assumes 16 centimeters was removed.

[14] The five doctor's appointments includes visits on November 1, 2016; November 18, 2016; December 30, 2016; January 11, 2017; and, May 10, 2017. *See* Exhibits 18 at 70; 19 at 2; 20 at 13; 20 at 21; Exhibit 21 at 7.

Petitioner also sought $43,930.96 to satisfy her Medicaid lien.  *Id.* at 5; 5 n.2; Status Report, filed Jan. 18, 2017 (indicating Medicaid lien amount) (ECF No. 67).

In support of the amounts requested, petitioner relied upon the fact that P.H. suffered multiple obstructions and surgeries.  *Id.* at 4. Thus, petitioner argued P.H.'s case was "extraordinary" and unlike any other previously litigated intussusception case in the Vaccine Program.  Petitioner maintains that the unique circumstances in this case merit a greater amount of pain and suffering than the amounts awarded in *Brooks v. Secretary of Health & Human Services.*  Pet. Brief at 4-5; *Brooks v. Sec'y of Health & Human Servs.*, No. 14- 563V, 2016 WL 2865709 (Fed. Cl. Spec. Mstr. Mar. 12, 2016).

Petitioner argued that *Brooks* "is the only case which even warrants a comparison to the present claim."  Pet. Brief at 4.  In that case, the child underwent the resection of approximately 40 centimeters of necrotic bowel.  *Brooks*, 2016 WL 2656110, at *2.  This surgery lasted for more than three hours, and the child remained at the hospital seven days after his surgery.  *Id.*  Subsequent to the surgery, the child suffered from severe diarrhea and resultant rashes.  *Id.*  The undersigned awarded $144,000.00 for actual pain and suffering and $70,000.00 (reduced to net present value) for projected pain and suffering in an unusually severe intussusception case.  *Id.* at *4.

Petitioner argued that P.H. suffered everything the child in *Brooks* did three times over and thus, the amount awarded for his past pain and suffering should be much greater than the amount awarded in *Brooks*.  Pet. Brief at 4.  With regard to future pain and suffering, petitioner lists consequences also suffered by the child in *Brooks*, such as complaints of pain due to scarring, self-conscious behavior regarding his scars, and the possibility of ridicule at school for frequent bathroom use.  *Id.* at 5.  Additionally, based on P.H.'s clinical course of diarrhea and anemia, it is likely that he will have chronic complications.  *Id.*

## B.    Respondent's Brief

Respondent argues that petitioner should be awarded a total of $100,000.00 for actual and projected pain and suffering, along with the amount needed to satisfy petitioner's Medicaid lien.  Res. Response at 6.

When comparing the facts in this case to those in *Brooks*, respondent stressed the greater amount of bowel removed during the one surgery performed on the minor child in *Brooks*, the fact that P.H. was doing well for approximately nine months after his initial surgery, the more severe diarrhea experienced by the child in *Brooks*, and the greater potential for continued diarrhea in that case.  Res. Response at 6.  As stated by respondent, the child in *Brooks* suffered diarrhea and rashes thought to be related to his intussusception surgery for more than four years and is forced to wear pull-ups to school three to four days a week.  *Id.*; *Brooks*, 2016 WL 2656110, at *2-3.  Additionally, the *Brooks* child's doctors have opined that he will likely continue to suffer episodes of

diarrhea following illness, treatment with antibiotics, and consumption of fruit and juice. Res. Response at 6; *Brooks*, 2016 WL 2656110, at *3.

Because Dr. Freswick opined that any diarrhea P.H. may suffer in the future is most likely due to excessive sugar intake, respondent argued the amount awarded for projected pain and suffering should be nominal in this case. Res. Response at 5; *see* Exhibit 16 at 1 (Dr. Freswisk's letter). Respondent also downplayed P.H.'s risk of developing future adhesions, arguing that any individual who undergoes abdominal surgery would have such a risk. Res. Response at 5. Respondent maintains that the risk that P.H. will require future surgeries is "unclear." *Id*.

### C.  Respondent's Motion for Reconsideration

On March 15, 2017, respondent filed a motion for reconsideration. Motion for Reconsideration at 2. Relying on *Youngblood*, respondent requested that the February 23, 2017 Decision be withdrawn because the statutory cap of $250,000 was not applied prior to adjusting the award for future pain and suffering to net present value. *Id*. at 2-3; *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552, 554-55 (Fed. Cir. 1994); 42 U.S.C. §300aa-15(a)(4)(statutory limit for actual and projected pain and suffering); 42 U.S.C. §300aa-15(f)(4)(A)(requirement regarding net present value). Additionally, respondent argued that the amount allowed for future pain and suffering should be reduced to net present value using a net discount rate of 2%. Motion for Reconsideration at 3.

### D.  Petitioner's Response to Respondent's Motion for Reconsideration

Petitioner sought an increase of her award in actual pain and suffering to $250,000.00 in consideration of P.H.'s ongoing pain and suffering since September 2016. Petitioner's Motion for Relief from Order and Response to Respondent's Motion for Reconsideration, at 1, 3, and 5 (ECF No. 73). Petitioner stressed the award in actual pain and suffering should reflect P.H.'s ongoing struggle with diarrhea, which required numerous recent doctor visits and testing. *Id*. at 3.

Alternatively, petitioner requested that the undersigned deny in part respondent's motion for reconsideration and reduce the present net value of the award for future pain and suffering by only 1%. Petitioner's Motion for Relief from Order and Response to Respondent's Motion for Reconsideration, at 1, 4-5. Because of the goal and nature of the Vaccine Program is to be favorable to petitioners, the petitioner argues that a 1% net discount rate is the appropriate reduction of the present net value of the award for future pain and suffering. *Id.*

## V.  Assessing the Appropriate Amount of Compensation

Examined individually, P.H.'s experiences would not rise to the same level as those suffered by the minor child in *Brooks* or the child in another intussusception case decided by the undersigned, *Neiman v. Secretary of Health & Human Services*, No. 15-631V, 2016 WL 6459618 (Fed. Cl. Spec. Mstr. Aug. 22, 2016). In *Neiman*, the

undersigned awarded an amount similar to that awarded in *Brooks*: $144,000.00 for actual pain and suffering and $74,000.00 (reduced to present day value) for projected pain and suffering. *Neiman*, 2016 WL 6459618, at *7. Considered in totality, however, P.H.'s three separate surgeries, his *C. difficile* infection, anemia, continued diarrhea, and scarring, all warrant a greater award for actual pain and suffering than that awarded in *Brooks* and *Neiman*.

In both *Brooks* and *Neiman*, the one hospitalization and surgery experienced by each child was more complicated and severe than the first surgery P.H. underwent. In each case, the child spent a greater amount of time in the hospital and recovered from the surgery in the pediatric intensive care unit. *See Brooks*, 2016 WL 2656110, at *2; *Neiman*, 2016 WL 6459618, at *2. In *Brooks*, approximately 40 centimeters of bowel, stretching into the distal ileum, were removed when the child was four months old. 2016 WL 2656110, at *2. The child in *Neiman* was two months old at the time of his surgery. 2016 WL 6459618, at *2. Following the surgery, he was treated for a suspected infection, was found to be anemic, and he was sedated and intubated for two days. *Id.* Although P.H.'s first surgery, when he was two months old, went well, his second surgery, when he was almost one year old, was complicated by a *C. difficile* infection. After that surgery, he spent nine days recovering in the pediatric acute care unit. Furthermore, P.H. underwent a third surgery in the fall of 2015.

P.H.'s claim is not the typical intussusception claim seen in the Vaccine Program. In total, P.H. spent more time in hospitals and operating rooms than the children in *Brooks* and *Neiman*. He was also significantly older when his later two surgeries were performed and thus, more aware of his circumstances. Moreover, the events P.H. experienced were spread over a much greater time period than the events the children in *Brooks* and *Neiman* experienced. Thus, he should receive a greater amount for actual pain and suffering than what was awarded in these other cases.

P.H. should receive a greater amount for actual pain and suffering than what was originally awarded in the February 23, 2017 Decision. Similar to the child in *Neiman* who struggled with malabsorption and loose stools, since the original decision P.H. has continued to suffer from diarrhea and its complications, including anemia, abdominal pain, and dermatitis. 2016 WL 6459618, at *3-4. These complications have required P.H. to visit the doctor numerous times and undergo additional testing. The additional doctor visits and testing coupled with the continuous diarrhea and its complications support the undersigned's finding to increase petitioner's actual pain and suffering award.

Due to P.H.'s three surgeries, *C. difficile* infection, and his ongoing struggle with anemia, diarrhea, and its complications, the maximum award for pain and suffering should be awarded. This decision is aligned with the purpose of the Vaccine Program

to compensate petitioners quickly and generously.[15]  Because the statutory cap has been reached, there is no need to consider the amount of future pain and suffering.

## VI.   Conclusion

For all the reasons described above, and based on the consideration of the record as a whole, the undersigned finds that $250,000.00 represents a fair and appropriate amount of compensation for P.H.'s actual pain and suffering.

**Based on the record as a whole, the undersigned finds that petitioner is entitled to a total award of $293,930.96 as follows:**

- A lump sum payment of $250,000.00, representing compensation for actual pain and suffering, in the form of a check payable to petitioner as guardian/conservator of P.H.'s estate;

- A lump sum payment of $20,910.21, representing compensation for satisfaction of part of the State of Michigan's Medicaid lien, in the form of a check payable jointly to petitioner and:

    First Recovery Group, LLC
    PO Box 771932
    Detroit, MI 48277-1932
    FRG File No.: 556181-121015
    Patient Name: Parker J Hill

- A lump sum payment of $23,020.75, representing compensation for satisfaction of part of the State of Michigan's Medicaid lien, in the form of a check payable jointly to petitioner and

    First Recovery Group, LLC
    PO Box 771932
    Detroit, MI 48277-1932
    FRG File No.: 539896-110515
    Patient Name: Parker J Hill

The undersigned approves the requested amount for petitioner's compensation. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment in accordance with this decision.[16]

**IT IS SO ORDERED.**

---

[15] *See Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, *1326 (Cir. 2011) (explaining "the Vaccine Program was intended to . . . 'provide[ ] relative certainty and generosity' of compensation awards in order to satisfy petitioners in a fair, expeditious, and generous manner.") (quoting *Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068, 1075, 179 L.Ed.2d 1 (2011)).

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master